UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
LAS VEGAS, NEVADA


UNITED STATES OF AMERICA,       )
                                )   Case 2:11-CR-0430-PMP-GWF
                Plaintiff,       )
                                )
        vs.                      )
                                )
ANN HILTON,                      )
                                )
                Defendant.       )   Las Vegas, Nevada
                                )   May 6, 2013
_____ )   2:32:27 p.m.
And related parties and cases)


**HEARING ON MOTION AND SENTENCING**


THE HONORABLE PHILIP M. PRO PRESIDING
DISTRICT JUDGE OF THE U.S. DISTRICT COURT


COURT RECORDER:

HENRY ENRIQUEZ,
U.S. District Court


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwranscripts.com

1

APPEARANCES:


FOR THE PLAINTIFF:        DANIEL SCHIESS,
                         Assistant U.S. Attorney
                         333 Las Vegas Blvd South, Suite 5000
                         Las Vegas, Nevada 89101
                         dan.schiess@usdoj.gov



FOR THE DEFENDANT:        RICHARD F. BOULWARE,
                         Assistant Federal Public Defender
                         411 East Bonneville Street
                         Las Vegas, Nevada 89101
                         Richard_Boulware@fd.org



ALSO PRESENT:             KELLI MORGAN,
                         U.S. Department of Probation

1   LAS VEGAS, NEVADA                        MONDAY, MAY 6, 2013

2                    PROCEEDINGS BEGAN AT 2:32:27 P.M.

3                               * * * * *

4          THE COURT:  Have a seat everybody.

5          All right, we're convened in United States of

6   America versus Ann Hilton, 11-Criminal-430.

7          The record should reflect the presence of the

8   defendant, Ms. Hilton, together with counsel, Richard

9   Boulware.  Dan Schiess on behalf of Plaintiff, United States.

10  Kelli Morgan on behalf of the United States Department of

11  Probation.

12         The matter is before the sentence -- before the

13  Court, rather, for sentencing.  Also recently filed, at

14  Document 42, was defendant's motion to withdraw a guilty

15  plea.  The government responded on May 2nd at Document 45.  So

16  perhaps we should address that first before we move forward

17  to address the issue of sentencing.

18         Mr. Boulware, of course, we had continued this

19  previously but go ahead and flush out for me exactly why you

20  think -- and particularly in light of the government's

21  response that the defendant should be permitted to withdraw

22  her guilty plea.  I don't see that there's a violation of the

23  plea agreement but maybe you can -- go ahead and raise that

24  up.  You know, expound on that for me.

25         MR. BOULWARE:  Your Honor, here's my basic -- our

1   basic position.  We specifically negotiated the plea, the

2   fact set [sic] on this agreement with the idea, obviously,

3   Your Honor, that there would be no additional facts in the

4   agreement.

5           Now the reason why we cannot put that explicit

6   provision prohibiting that in the agreement is it's contrary

7   to the law.  If you read the Ninth Circuit's law it says that

8   if government counsel has asked questions, right, they have

9   to be able to respond.  So we cannot tell defendants -- and

10  that's in the cases that I cited, that you explicitly

11  prohibited the government from bringing additional

12  information because that would be contrary to what actually

13  is Ninth Circuit law.

14          THE COURT:  But where a defendant is seeking some

15  variation departure from an advisory guideline range, isn't

16  the government within its, not only its rights but its

17  obligation to set forth the facts and response?

18          MR. BOULWARE:  Your Honor, I don't think so because

19  if you looked at -- and part of this relates to two issues.

20  One is what was her understanding of our agreement?  Your

21  Honor, had I thought that that was our agreement I would have

22  included facts related to relevant conduct which I thought

23  were mitigating with respect to my client.  I mean, it's

24  often the case that there are additional facts that we have

25  and we say, well, wait a minute, just because we're pleading

1   guilty, let's look at the facts of what happened here.   We

2   don't believe that they were vulnerable victims.   We believe

3   those individuals knew what my client's business was.   They

4   worked in the business, for example.

5           Those are facts, Your Honor, that I would have

6   brought to Court's attention had I believed that I could

7   actually discuss facts of the offense conduct.   If you look

8   at my sentencing memorandum, Your Honor, and the Court has

9   seen different memorandum from me before, I have discussed

10  facts with respect to offense conduct where I thought it was

11  permitted.   My sentencing memorandum reflected what I

12  believed that our agreement was, Your Honor, which is that we

13  had to use the relevant facts in the negotiated fact section.

14  That is why I assiduously avoided any discussion whatsoever

15  of any relevant mitigating facts because often there are even

16  in the offense conduct.

17          Your Honor, and part of that reflects, Your Honor,

18  again my understanding of the agreement.   I'm not saying that

19  Mr. Schiess necessarily intentionally did that.   What I can

20  say to the Court is I negotiated plea agreements for over 10

21  years as a public defender, I've never in a situation where

22  there's a negotiated fact section, Your Honor, where I did

23  not bring up facts, understood that the government could ever

24  bring up additional relative negative conduct that had not

25  been discussed.   If that were the case, Your Honor, it would

1  completely negate our agreement as to the fact section.

2  Otherwise there would be no point for me to negotiate a fact

3  section, Your Honor, in this case allowing additional

4  relevant conduct if I thought they could come in and bring

5  additional relevant conduct in the first place.

6        If you look at, again, my memorandum, it reflects I

7  think and confirms, Your Honor, what our understanding was.

8  And, Your Honor, as I've stated in my memoranda, the Ninth

9  Circuit has very clear rules about the term of an agreement

10 if they're ambiguous being construed in favor of the

11 defendant.  The fact that in this case, obviously, the

12 drafter of the [unintelligible] the government, the terms

13 are construed against the government.  We have specific

14 terms which should trump general terms.  And I never thought

15 I'd have a chance to use that but the expressio unius est

16 exclusio alterius construction, Your Honor, that explicitly

17 say, well, we have explicitly identified information that is

18 meant to cover the entirety of the agreement as to the facts.

19        And I went back to look at this, Your Honor.  The

20 Ninth Circuit basically said, they can bring in facts where

21 for example, if I had misstated facts, Your Honor -- if I had

22 -- and that's why I didn't put any offense conduct facts in

23 my agreement, Your Honor.  I didn't want there to be anything

24 in my memorandum that the government could then use that one

25 clause to trigger its use of additional relevant facts

1   because I'm aware of these facts, Your Honor.  It's not like

2   I'm not aware of the fact there's additional relevant

3   conduct.  The whole benefit of a plea agreement, Your Honor,

4   is in essence obviously to narrow the facts for both the

5   government and the defense.  That's part of the reason why we

6   engage in a plea agreement.  Otherwise, Your Honor, what

7   would be the point in this case?  I would just plead my

8   client straight up if essentially all the -- excuse me, if

9   all the relevant conduct could come in.

10          And I --

11          THE COURT:  As I understand it, the government's

12   bottom line in its response is that it is seeking by way of

13   sentence in this case a low end guideline sentence as I

14   believe they bargained for in the plea agreement.  Am I -- am

15   I correct in that regard?

16          MR. BOULWARE:  That's correct.

17          THE COURT:  It's not seeking to deviate from that.

18   It's using the reference to any additional facts only or

19   attempting to only insofar as it would be responsive to an

20   argument that a sentence should be below that, to some

21   degree?

22          MR. BOULWARE:  That's correct, Your Honor.  And my

23   response to that would be -- would be this again, Your

24   Honor.

25          There are arguments they could raise that don't

1  require them to bring up additional relevant conduct and this

2  Court has heard them on numerous occasions.  The fact that my

3  client's personal circumstance may not necessarily be

4  extraordinary enough to outweigh what would be the other

5  factors in the 3553.  I mean the Court knows that there are

6  multitude of arguments that can be raised to negate what were

7  essentially my arguments.  Basically, Your Honor, it wasn't

8  that these weren't the facts, it was let's look at the whole

9  picture.  There -- you know I'm not going to raise them all

10 here, but there are lots of arguments that can be raised that

11 don't require bringing up additional relevant conduct outside

12 of our agreement to negate that.  And the Court has heard

13 those before and has actually ruled on those before because

14 I've been before the Court where the Court has essentially

15 said, I hear what you're saying about your client but there

16 are important facts here, Your Honor.

17       So -- and I think the most important factor here,

18 Your Honor, so the Court can understand is that that's not

19 what we understood.  So if that's not what I understood, Your

20 Honor, that's not what my client understood the agreement to

21 be.  And again, I'm not -- I'm not accusing, Your Honor, of

22 Mr. Schiess of intentionally engaging in a breach of the

23 contract but nonetheless, Your Honor, it violates what we --

24 I, my client understood the contract to be what we -- under

25 what we understood the agreement to be, Your Honor.  And

1   that's why we specifically negotiated the fact section and

2   that's what I went over, Your Honor, with my client.

3          So part of it is also just -- also her

4   understanding, Your Honor, which I have confirmed with her.

5   But it was also my understanding.  I mean the reason why I

6   know it's her understanding, Your Honor, is because it was my

7   understanding.

8          THE COURT:  All right.

9          MR. BOULWARE:  I mean -- so.

10         THE COURT:  All right.  Well, let me hear from Mr.

11  Schiess.

12         Mr. Schiess.

13         MR. SCHIESS:  Your Honor, there were no side

14  agreements.  There were no agreements to facts that were not

15  stated to the Court.  There were no agreements that were not

16  kept out of the plea agreement.

17         The plea agreement specifically says that.  On page

18  14, the very last paragraph in the section encaptioned,

19  "Additional Acknowledgments."

20         "This plea agreement resulted from an arms

21      length negotiation in which both parties bargained

22      for and received valuable benefits in exchange for

23      valuable concessions.  It constitutes the entire

24      agreement negotiated and agreed to by the parties.

25      No promises, agreements or conditions other than

1    those set forth in this agreement have been made or

2    implied -- implied by the defendant, defendant's

3    attorney or the United States, and no additional

4    promises, agreements, conditions shall have any

5    force or affect unless set forth in writing and

6    signed by all parties or confirmed on the record

7    before the Court."

8         I did not have an agreement with him that would

9    limit my argument to those facts if and when he decided to

10   file a motion for departure below the low end of the

11   guideline range.  We had a back and forth on what the facts

12   would be for the purposes of supporting the guilty plea and

13   for the purposes of supporting a recommendation for low end.

14   Mr. Boulware went beyond that by filing his motion for 2255

15   -- or excuse me, 3553.

16        Now I think what's helpful here is that when he's

17   talking about what I can or can't or should or shouldn't

18   argue, a couple of things to note.  Number one, when he opens

19   the door with his 3553 argument, he opens the door.  There's

20   no limitation other than what's fair, lawful, and appropriate

21   by the plea agreement and by the rules of the Ninth Circuit

22   and this Court.

23        My arguments were within the Ninth Circuit, the

24   plea agreement, and the rules of this Court.  He cannot sit

25   back and say, I framed the issue so strategically that I tied

1  the government's hands.  He can't do that.  In fact, his slip

2  of the tongue in his argument to you a few minutes ago is

3  revealing.  He said, when we makes the argument the

4  government should say let's look at the whole picture.  That's

5  right, the whole picture about not only what she does to her

6  family and her community but what she's done to these victims

7  and to other victims as well.  That's the whole picture.

8           The plea agreement is not ambiguous as to terms.

9  There's no conflict between the provisions that deal with the

10  facts to support a guilty plea and the provisions that state

11  what I can do in response to a motion to depart.  Those are

12  separate provisions, separate purposes without a conflict.

13           And finally Mr. Boulware said, if he knew that I

14  was going to be making these arguments he would have made

15  different arguments or mitigating arguments.  There is

16  nothing that stopped him from filing a response to my

17  sentencing memorandum setting forth mitigating facts.  There

18  is nothing that has stopped him in the last two months, since

19  the continuation of this hearing, to identify mitigating

20  facts.  There's nothing to stop him from standing on his feet

21  in a couple of minutes and identify mitigating facts.  So

22  he's not deprived of -- that he hasn't been deprived of that

23  opportunity.  He's not deprived of it now, so there's nothing

24  unfair both from the plea agreement and from the effect of

25  the plea agreement.

 1              THE COURT:  All right.  Well, look here's the way I

 2   view it.  I'm going to deny the motion to withdraw the plea

 3   of guilty at Document 42.  I don't find a violation of the

 4   plea agreement in terms of the plea agreement has occurred.

 5   The -- as Mr. Schiess just said, the plea agreement is not

 6   really ambiguous, it's clear.  And I don't think either of

 7   the parties or for that matter the Court could be trapped or

 8   boxed into a situation where a legitimate issue is raised or

 9   fact is raised as I think the defendant appropriately raised

10   in their sentencing memorandum as grounds for a sentence below

11   the guidelines.  I don't find that would constitute any

12   violation of the agreement and similarly, I don't find the

13   government responding to that would constitute a violation

14   and certainly nothing that would warrant a withdrawal of the

15   plea.

16              So we will proceed with the sentencing and let you

17   all argue what the consequences should be in your view under

18   3553 of Title 18.

19              Ms. Hilton, on the 9th of November of last year you

20   entered a plea of guilty to the charge in Count Two of the

21   indictment, that charge being wire fraud, a violation of 18,

22   U.S. Code, Section 1343.  At this time I adjudicate you

23   guilty of that offense and I want to remind you that to the

24   extent you've not waived your right to do so, any appeal of

25   sentencing findings would have to be started by filing a

1  notice of appeal within 15 days of this date.  Do you

2  understand that?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Now the Department of Probation

5  prepared a revised presentence report.  It's actually been

6  through a couple of revisions but the most recent was on

7  April 11th, 2013.  I want to make sure the parties have read

8  the most recent version and correct any factual errors.

9          Mr. Schiess, are you aware of any factual errors in

10 the most recent presentence report revision?

11          MR. SCHIESS:  No, Your Honor.

12          THE COURT:  And, Mr. Boulware, are you?

13          MR. BOULWARE:  No, Your Honor.

14          THE COURT:  And, Ms. Hilton, did you read the

15 updated presentence report?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  And did you see any factual mistakes in

18 it?  Biographical information, anything else that was not

19 accurate?

20          THE DEFENDANT:  Not that I'm -- I did not catch

21 anything, Your Honor.

22          THE COURT:  Okay.  All right.

23          The Department of Probation has calculated the

24 offense level at a level 16, Criminal History Category is a

25 Category I, so under the advisory guidelines that provides

1  for an applicable range between 21 and 27 months.  The

2  Department of Probation recommends the low end sentence of 21

3  months.

4       The supervised release range is one to three years.

5  Probation has recommended a three-year term on standard

6  conditions and certain special conditions.

7       The fine range is $5 to $50,000.  No fine is

8  recommended.

9       Restitution of $480,490 -- $400.97 [sic] is

10  recommended and of course the mandatory penalty assessment of

11  $100.

12       Both parties have filed sentencing memoranda which

13  pretty much set forth their positions regarding sentencing.

14  The defendant's at Document 37 and filed March 13th.  The

15  government's is filed March 15th at Document 38 which were

16  prior to the most revision of the presentence report

17  obviously, but you can supplement that if you wish to with

18  any argument you wish to make.

19       But let me start with you, Mr. Schiess, as to the

20  government's specific position regarding what the appropriate

21  sentence is in Ms. Hilton's case.

22       MR. SCHIESS:  Thank you, Your Honor.

23       Your Honor, we ask the Court to sentence Ms. Hilton

24  to the low end of the guideline range as we promised her that

25  we would recommend.  Our recommendation is a sound one.  It's

1   based upon both the facts of the case that are in -- unique

2   to her in some ways and common to the scheme to others.

3          In part it's the uniqueness that justifies the 21-

4   month sentence.  And the other circumstances that I set forth

5   in the sentencing memorandum, then let me address each parts

6   of those if I may?

7          During this time in our economy and in our society

8   it was common for people to commit mortgage fraud.  The Court

9   has heard a number of cases and sentenced a number of people

10  so you know the pretty common scheme that was going around.

11  What sets Ms. Hilton's conduct apart from the others is not

12  the number of transactions, not the dollar amounts, but who

13  her victims were.  She had a special relationship with these

14  people.  They worked for her.  They worked for her making $12

15  to $15 an hour doing her household chores, her domestic work

16  or whatever business tasks of being a runner for her as she

17  was carrying out her investments.  One of them was in her

18  70s, the other was in her mid-40s.  She was recently divorced

19  and she was going through the difficulties, the emotional

20  instabilities of those events.

21         What Ms. Hilton did didn't begin with them as

22  victims.  What she did was persuaded other people to loan her

23  money and then gave them a deed.  Some document, a security

24  interest against these two ladies victims' homes.  And those

25  people, other investors, the well-heeled people, the people

1  who had money wanted their investments back and so she needed

2  to find a way to payback the 70 year old and the 40-something

3  year old recently divorced mother.  So she then put the

4  pressure on them to refinance their homes.  And she took that

5  money under promises that she would invest their money in a

6  good deal for them that would make them significant money and

7  she paid off the other victims.

8          And so it was a Ponzi Scheme.  It was a

9  sophisticated scheme.  It was a scheme that took steps along

10  the way that somebody with her confidence and her competence,

11  Ms. Hilton's confidence and competence and ability to

12  convince people, particularly people who are in a special

13  relationship.  Not only an employee but in emotional

14  dependency at times.

15          So she took advantage of those people which

16  distinguishes her from typical mortgage fraud case that was

17  going on in a lot of ways.  And not only that, as I pointed

18  out, then she went to the mother of the 40-something year

19  old, who was in her late 70s, and convinced her to refinance

20  her home.  There were no false statements in the loan

21  application but there were false representations about here's

22  how I'm going to make sure this is good and solid, you're in

23  a good investment.  Leading people to believe that when

24  they're on a low income, small pension making a small income

25  in terms of, you know, part-time dollar an hour, that with

1  her experience, you can trust me.  You can believe me.  I'm

2  going to take care of you.  And that's what she did, took

3  advantage of that relationship.

4         And that, Your Honor, is -- justifies, justifies a

5  21 month sentence for these people with their age and their

6  positions in life.  Two of them have lost their homes in

7  foreclosure.  One of the lady in their 70's mother who is the

8  relevant conduct.  The 40-something year old.  The 70-year-

9  old has been fighting the battle against the lender now and

10 so we don't know the outcome yet to see what the result of

11 their civil lawsuit is, but the emotional difficulties that

12 she's had to through the fraud perpetrated by the defendant.

13        Now I told the Court that -- of the distinguishing

14 characteristics of the defendant's conduct.  I also told the

15 Court that there was commonality.  It was in someways similar

16 to what a number of other mortgage fraudsters have been doing

17 in Nevada since '06, '07.

18        At the last -- at the original sentencing hearing

19 set for a couple months ago, defense counsel asked for a list

20 of the names of the defendants who have been sentenced and

21 the case numbers.  I provided him not only that list but I

22 provided him more.  I provided him the name of the

23 defendants, the disposition, whether they received 5K or Rule

24 35, the sentence they received, and the forfeiture and the

25 restitution amount.  Now -- and the list totals when I -- when

1   we comprise the list which I have to tell the Court was just

2   after that sentencing so it may have been a couple of people

3   sentenced since then, but there were 131 people who have been

4   sentenced.  There's over 200 who have been charged and so the

5   remaining 68 or 70 are pending sentencing, pending trial or

6   pending resolution.

7           The sentences that these people have received have

8   been across the board.

9           THE COURT:  Of course.

10          MR. SCHIESS:  From people who received probation,

11  when they received a 5K or no 5K they got probation or time

12  served.  To people who are very similarly situated to them in

13  their conduct who received 27, 33 months.  In some situations

14  more but within that range mostly.

15          And so, you know, we can say yes there are people

16  who are at the low end, probation.  Yes, there are people at

17  the high end, which really puts the Court in the position of,

18  I've got to look at this person individually meets [sic] facts

19  and I submit to the Court that the uniqueness of her conduct,

20  of victimizing people with a special  relationship who are

21  older, who are more fragile in their lives sets her apart and

22  justifies and cries out for a sentence of 21 months and would

23  meet the needs of the sentencing considerations under 3553 and

24  the others.  You  know a sentence that will send to her the

25  message, will send to the community the message, will be no

1  more than necessary to achieve the results.  All those

2  factors, I think would be  -- I know and I argue would be

3  effect -- would achieve the 21 months when the Court looks at

4  the uniqueness and special relationship she had with people,

5  her victims.

6           THE COURT:  All right.  And you submitted a

7  restitution list for Deutsche Bank and Signature Group

8  Holdings?

9           MR. SCHIESS:  I did and that's consistent with the

10 amount in the --

11          THE COURT:  380 -- 480,000 roughly.

12          MR. SCHIESS:  Yes.  And then I've also submitted to

13 the Court the order of forfeiture --

14          THE COURT:  Correct.

15          MR. SCHIESS:  -- in that amount as well.  The more

16 [sic] to forfeiture amount has been negotiated.  The

17 restitution amount comprises -- well, that's what it is that

18 we've negotiated the figures.

19          THE COURT:  All right.

20          MR. SCHIESS:  Thank you, Your Honor.

21          THE COURT:  All right.  Thank you, Mr. Schiess.

22          Mr. Boulware, why don't you and your client come on

23 up.

24          MR. SCHIESS:  Before you start to [unintelligible]

25 to see if I'm being corrected here.

1           THE COURT:  I'm sorry?

2           MR. SCHIESS:  Oh, thank you.  Sometimes the voices

3   over my shoulder tell me if I misspoke and this time they

4   didn't tell me that.

5           THE COURT:  Oh, okay.

6           MR. BOULWARE:  No.

7           THE COURT:  All right.  Donna, here's that

8   restitution list for your records.

9           MR. BOULWARE:  Your Honor, for the record we're not

10  opposing the forfeiture amount and so long as we can confirm

11  that the restitution's going to the actual last victims,

12  pursuant to the Ninth Circuit decision, Your Honor, I don't

13  think we'll have an opposition to that either.

14          THE COURT:  Right.  The two banks or --

15          MR. BOULWARE:  Yeah.

16          THE COURT:  -- the -- the holding group of the

17  bank.

18          MR. BOULWARE:  Your Honor, obviously we do not

19  agree or concede any of the facts that Mr. Schiess just set

20  forward.  I think the only thing that we would agree, Your

21  Honor, is the fact that these women worked with my client.

22  And that's an important fact because distinguishing is not

23  for the reasons Mr. Schiess says, Your Honor.

24          My client was a high risk investor, Your Honor, in

25  properties and in other ventures.  She had been doing this

NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwranscripts.com

1  for years, Your Honor.  These women were well aware of it.

2  They worked with her.

3      It was -- it was not as if they believed that she

4  was a stockbroker or a mutual fund investor.  They knew, Your

5  Honor, what my client did was lend out money for high risk

6  ventures with the hope of a significant return.  That had

7  been her business, that had been part of her business.  They

8  had worked with her on projects related to that.

9      Now, were they ones who would buy the investments?

10 No.  Am I suggesting to the Court that they were part of

11 negotiating the financial terms?  No.

12      What I am saying, Your Honor, is that these were

13 individuals who understood the nature of the risk of the

14 investment.  And let's be clear about what they did receive.

15      THE COURT:  Well, what were the investments that

16 were made with their money on their behalf?

17      MR. BOULWARE:  Your Honor, the understanding again

18 is that they would be -- Ms. Hilton engaged in a variety,

19 Your Honor, of high risk investments involving lending.

20      THE COURT:  Right.

21      MR. BOULWARE:  And so --

22      THE COURT:  But here what -- the money that was

23 derived from the financial --

24      MR. BOULWARE:  Would be part of -- would be a part

25 of -- she was involved in several projects at that time.

NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwranscripts.com

1    Part of it would be involved in those types of investments,

2    Your Honor.  And again, I'm not going to say what exactly the

3    words were cause I can't speak to that.  What I can say is my

4    argument is based upon the idea that they understood that

5    their money was going to be involved and mixed in with other

6    investments in terms of her lending to high risk investors or

7    high -- on high risk projects.  So --

8            THE COURT:  Well, but -- but were in fact the

9    monies that she obtained from the employee victims from the

10   refinancing of their homes used to pay back or return

11   investments demanded by other investors?

12           MR. BOULWARE:  There's a two-part answer to that

13   question.  Part of the money, Your Honor, was used -- was

14   actually used to pay off all of their debt.  So all their

15   credit cards and all of that was actually paid off with the

16   initial amount of money, which was part of the agreement.

17           THE COURT:  Part of the employees?

18           MR. BOULWARE:  Yeah, the investor.  In this case

19   what the government calls the victims, these individuals --

20           THE COURT:  All right.

21           MR. BOULWARE:  -- their personal debt --

22           THE COURT:  Okay.

23           MR. BOULWARE:  -- was paid off and they received

24   some additional money out of that.  And, yes, some of the

25   money from that then went to payoff some of the debt that Ms.

1    Hilton had.

2            Now, the reason why I say that that's part of the

3    investment, Your Honor, is that part of her ability to invest

4    money was the liquidity which she had.  So obviously -- and

5    that's why I say understanding what the nature of her

6    business is helps to understand why simply her paying off her

7    debt isn't in and of itself an investment because increased

8    liquidity for her allows her to be able to loan money on

9    other projects which is what she was doing.

10           So it's not as if it's a Ponzi Scheme, Your Honor,

11   when a -- when and a -- when someone who is actually lending

12   money gets increased liquidity, that increased liquidity can

13   be used for other projects which would be used to pay back

14   the investment.

15           THE COURT:  Well, the term Ponzi Scheme can be

16   thrown about pretty easy but isn't in fact the use of monies

17   drawn from third, fourth, and fifth generation investors to

18   pay back first and second generation investors or the returns

19   on their investment precisely what the kind of Ponzi Scheme

20   involved originally and -- and --

21           MR. BOULWARE:  Usually, Your Honor, it does when it

22   -- is in the context of return on specific services.  So in

23   other words, if I am saying I'm buying stock and you're going

24   to get a return on the stock and then I'm actually not buying

25   the stock but I'm paying people with other money to say

1  that's the yield from the stock, that would be a Ponzi Scheme.

2  But when my business is lending in liquidity, like that is

3  different because obviously in that instance the person is

4  getting paid off and the other people are getting paid off

5  because part of the business is getting paid off from the

6  investment.  As for example, a venture capitalist or angel

7  investor, they get paid out simply in cash.  They don't get

8  paid out in services.  They don't get paid out in property.

9  They get paid out in money.

10         And so in this instance, Your Honor, I think that's

11  an important distinction.  It's not as if there was a promise,

12  and that's why I say, Your Honor, about mutual funds or some

13  other type of fund or some other we're going to invest in,

14  you know, an oil well or something like that.  This was an

15  investment in her business and terms of making investments.

16  That is what she did.  And so I think that distinguishes her

17  and -- from what Mr. Schiess calls a Ponzi Scheme because it

18  wasn't as if there's a promise that she would get a yield on

19  a particular investment that would have like 5 or 10 percent.

20  The idea was that they would give her this money and she

21  would continue to invest, as she had been investing, to make

22  money.

23         And the other thing, Your Honor, let's be clear,

24  she had in fact been making lots of money for her clients up

25  to this time.  So it's not as if it was just steadily money

1   flowing out the whole time, Your Honor.  She had made

2   investments in money for people and that's part of the reason

3   why these women invested with her.  They could see the money

4   that she was come -- that she was bringing in.  I mean they

5   wouldn't have invested with her and working with her, and

6   people who were aware of her finances had they not known that

7   in fact that she was successful in what she was doing.

8          Now, Your Honor, and she made promises to them and

9   she made -- even in the statements in the discovery show,

10  Your Honor, that the women still believed in her and believed

11  that she was going to try to pay them back and in fact, she

12  did.  Your Honor, my client herself went completely bankrupt

13  in this whole process.  She lost all her money.  She lost --

14  she doesn't have anything.  She doesn't have a job.  They --

15  she's dependent upon her husband's work but she had been

16  working herself involved in very significant and high risk

17  ventures.  So it's not as if they paid and she -- she's

18  living in a large house and driving expensive cars.  She has

19  lost everything with them, with her business.  Her business

20  is now defunct and essentially has no assets.

21         And so I think it's important because these were

22  not, Your Honor, vulnerable victims.  These were people as a

23  result of working with Ms. Hilton who are intimately familiar

24  with both the success that she had had as an investor and how

25  she made her money.  They did not think that it was coming

1  from other certain types of investments.  And, Your Honor,

2  they understood that there was risk associated with that and

3  they understood that she would be with them if the risks

4  didn't work, which she was and as a result her business went

5  belly up.

6         And that's why, Your Honor, you see the statements

7  from the individuals in discovery talking about how the fact

8  that they had worked and they had tried.  And in fact, Mrs.

9  Hilton, as I said, Your Honor, had paid off debt for some of

10 these individuals and had supported them and continued to try

11 to support them as best she could until all her money ran out

12 as well.

13        Your Honor, my client has accepted responsibility

14 for the fact that this money is not fair [sic] and that there

15 were misdeeds here.  I am not trying to say to the Court that

16 she should get a free ride.  I would not say that to the

17 Court.

18        What I'm saying, Your Honor, is that my client, as

19 a businesswoman, as a mother, as someone who was other than

20 with just the defense conduct should get the benefit of the

21 balance of all that time there [sic].  That she has no prior

22 convictions.  That she worked with these women.  That as the

23 Court can see from the letters, she's done very good things

24 in the community, Your Honor.  And that's why, Your Honor, I

25 try to reiterate that because again the guidelines don't take

1  that into consideration and I know that sometimes it's easy

2  for us to gloss over that. Yeah, but for someone like Ms.

3  Hilton, a felony conviction is serious. I mean you and I day

4  in and day, Your Honor, we do these things on a regular basis

5  and I think we can become a little bit jaded, not that we

6  should, by what a felony conviction means to people.

7         But as you speak, particularly when the guidelines

8  talk about this, to someone who has never had a conviction,

9  let alone a felony conviction in her life. And that's why I

10  outlined in my memo, Your Honor, particularly in the state

11  where she lives what that -- what that's like, that life is

12  like. Essentially almost living with the scarlet letter of

13  an "F" across her chest given the fact that you have this

14  conviction.

15         I'm not asking the Court to give her a free pass.

16  What I'm asking the Court to do is essentially give her a

17  balanced sentence, Your Honor, taking everything into

18  consideration.

19         And the one thing I would address with respect to

20  what Mr. Schiess said is, there are people, Your Honor, who

21  have received probation or home confinement during the

22  context of this sting that they've did on mortgages. And

23  what I would say, Your Honor, is why I think in this

24  instance, Your Honor, there is a reason for that is what I've

25  outlined before. That these were individuals who are not in

1   anyway snookered, who understood that there were risks.  They

2   cut corners but they cut them together.

3          Your Honor, let's be clear, the quote, unquote,

4   "victims" in this case in terms of the loan documents, they

5   were a part of that process.  It's not as if they didn't

6   know, Your Honor, that corners were being cut.  Legal corners

7   were being cut for them to get that money.  It's not as if

8   they didn't know, Your Honor, that that information had been

9   mischaracterized for them to get the money.  And they didn't

10  complain, Your Honor, when their debts were paid.  They

11  didn't complain when they received the extra money initially

12  from the payoffs, right?

13         Mr. Schiess has categorized them as people who were

14  victimized.  Well, wait, Your Honor, that is not -- a victim

15  is someone who's unaware.  They were not unaware.

16         Now the government makes a strategic decision in

17  all these cases, Your Honor, not to charge straw buyers.

18  They have never charged, as far as I know, a pure straw buyer.

19  Despite the fact that straw buyer is an intimate part of the

20  conspiracy, if the conspiracy cannot actually be effective in

21  loan cases without straw buyers being charged and that for

22  the most part they don't charge them.  But we should not

23  forget that the women who were involved in this investment,

24  Your Honor, were fully aware of the fact that the legal

25  corners that were being cut were being cut.  And that my

1  client is the only one facing the consequences for that.

2  They have not been charged, not at all, despite the fact that

3  they participated in the bank fraud.

4        So I think that that's what I mean, Your Honor,

5  when I say the entire picture and entirety of sentencing.  I

6  ask the Court to consider all of that in the context of these

7  cases and not simply what's outlined in the PSR and not

8  simply what's outlined in the government's memorandum.

9        Thank you.

10       THE COURT:  All right.  And come on -- stay up here,

11 Mr. --

12       MR. SCHIESS:  Your Honor, before you do that may I

13 respond to the facts that he's saying?  Because --

14       THE COURT:  Yeah.  Go ahead.

15       MR. SCHIESS:  Your Honor, first he says that they

16 knew these were high risk investments and where the money was

17 going.  That contradicts the plea agreement, the very facts

18 that we negotiated.  The facts on the -- page 4 says:

19       "It was -- the defendants persuaded them to

20       refinance their homes and invest the money they

21       obtained from refinancing with defendant by

22       defendant promising to invest their money for them

23       when the defendant then and there well knew that she

24       would use the money for her personal benefit."

25       Not an investment.  She lied to them.  Even if they

1    were sophisticated, she told them she was going to invest it.

2    She didn't.  She did it for her own personal to payback

3    people that she snookered in the first place to get money who

4    were pressuring her to say, hey, where's the money?

5           THE COURT:  All right.  I understand what's in the

6    plea agreement.

7           MR. SCHIESS:  Number two, he says that these people

8    were sophisticated.  They were her housekeepers.  They

9    weren't involved in her business.  They were her housekeepers

10   or they were doing her runner work.  They were not

11   sophisticated.  A 70-year-old lady who lived on a pension who

12   had a regular job didn't understand what was going on.

13   Forty-year-old mother who's -- was not in that business world

14   didn't understand what was going on.  It's because of their

15   relationship with her.  They trusted her.

16          In terms of paying off their credit.  Yes, she took

17   some of the money to pay the credits so they could make that

18   part of their loan applications to qualify.  The rest of the

19   money goes into her pocket, not to investments for people

20   that trusted her.

21           THE COURT:  Come on up, Mr. Boulware, with your

22   client because I want to hear anything that Ms. Hilton wishes

23   to say on her own behalf.  We've heard from everybody else

24   but, Ms. Hilton, is there anything that you wish to say?

25          MR. BOULWARE:  Your Honor, can I just have a moment,

1  please?

2        THE COURT:  Yeah.

3        MR. BOULWARE:  Thank you.

4    (Off-record colloquy between Counsel and Defendant)

5        MR. BOULWARE:  Your Honor, my client does not wish

6  to make a statement.

7        THE COURT:  All right.  You're not required to, I

8  just wanted to make sure you had the opportunity.

9        Well, Ms. Hilton and counsel, first of all, I don't

10  find this to be some aberrational kind of case.  Each case is

11  individual in terms of the individual defendants, the

12  circumstances, and as a result I'm not surprised there's a

13  wide array of sentences imposed for similar kinds of cases:

14  fraud cases, mortgage fraud cases, and the like.  But each

15  case has to rise or stand on its own and I think this case

16  does and I think that the plea agreement that was negotiated

17  and the guideline range that was focused on by the Department

18  of Probation is very useful in determining an appropriate

19  sentence.  That is a sentence which is sufficient but not

20  greater than necessary to meet the factors under 3553 of

21  Title 18.

22        And we all know them and we begin by looking at the

23  guidelines and the guidelines serve a variety of purposes.

24  One of the, perhaps the most useful I think in their advisory

25  nature is avoiding disparate sentences.  They give a

1  benchmark that a Court can look to as providing some

2  assurance that a sentence which does not vary or depart

3  wildly from that guideline range is probably going to avoid

4  the plague of disparity.

5          This is a case that is about fraud.  It's just that

6  simple.  It's making false representations to induce people

7  to part with something of value.  Money in this case.  And

8  here the money, either entirely or at least portions of it,

9  were obtained from these victims to convert the use of the

10 defendant.  I'm not going to spend time talking further about

11 Ponzi Schemes or even sophistication of the victims.  There's

12 no enhancement proposed under the guidelines for vulnerable

13 victims in this case.  They are victims and I can't look into

14 their minds any more than I can look into anybody else's mind

15 to know what they knew or what they understood.  They may be

16 as innocent as lambs.  They may be sophisticated as some of

17 the most savvy Madoff investors.  I don't know.  I don't

18 think it really matters at the end of the day.

19         Because the defendant has to be sentenced for her

20 conduct.  What she intended.  What she did.  And she stands

21 convicted of a serious crime of wire fraud and that carries a

22 very severe criminal penalty of up to 20 years in prison.  Of

23 course, there are a lot of factors that weigh in favor of a

24 more lenient sentence for the defendant.  Her absence of

25 prior criminal record.  They are many things, just like every

1   person who comes before me for sentencing.  Everyone, it's

2   not one dimensional and many facets to human beings.  They've

3   got families.  They've got things that they've done in their

4   community and particularly so of those who are found guilty

5   or plead guilty to white collar type of crime, to fraud type

6   of crimes.

7        Mr. Boulware's right, a felony conviction is

8   probably more meaningful to you or to any one of us in the

9   room than it is to someone who's been in and out of prison

10  since they were very young and drug cases and things of that

11  sort.  It doesn't have the stigma perhaps for them that it

12  does for you in your community where you live and the circles

13  that you have moved about for many years, just as it would

14  for us.  But that's part of the importance of deterrence of

15  influencing people not to violate the law.

16        And I have to fashion a sentence that reflects the

17  seriousness of the crime and this is a serious crime

18  involving fraud and involving a lot of money lost.  It's a

19  small piece of a much larger picture that has become simply

20  ubiquitous in our society.  Not just this community but

21  throughout the country to promote respect for the law.  How

22  do you promote respect for the law if there isn't a penalty?

23  If there aren't consequences for the wrongdoing that is done

24  by someone who commits a fraudulent crime?  To provide just

25  punishment.  You know, 21 months versus 25 months versus 18

1    months.  We could debate that all day long.  The only person

2    it probably really matters to is you.  You're the person

3    that's facing the sentence, and your family, they're beings

4    sentenced too.  That's the penalty that's being visited and

5    that's the punishment.  I think that guidelines do

6    accommodate that.

7            To avoid adequate deterrence to criminal conduct by

8    you and by others, I doubt seriously much has to be done to

9    deter you from further criminal conduct.  I would think by

10   now you've woken up and smelled the coffee and realize this

11   is just plain sad for you personally, for your family, and a

12   tragic circumstance that you find yourself in.  You put

13   yourself there.  You're responsible for it.  I doubt

14   seriously that you would engage in anything like this in the

15   future, Ms. Hilton, but perhaps others would be deterred to

16   protect the public from further crimes.

17           Again, I don't view you as a recidivist who's apt

18   to go out and commit new crimes of any kind.  I'd be

19   surprised if you did.  There's no real element of education

20   or training but to avoid sentencing disparities as I

21   mentioned, I think all of those are accommodated by the

22   recommendation of the Department of Probation.  You were a

23   person in a position of financial trust.  Not just as a loan

24   officer but investor.  You persuaded these individuals to

25   refinance their houses in which they did have substantial

1  equity; under a promise that you would invest the money and

2  under false promises that you would invest it -- not that you

3  would convert it to your own use and for your own benefit,

4  which is in fact what occurred.

5        Don't know where the money is.  I expect it's

6  gone.  You'll have to do your best to repay it while on

7  supervision.

8        BUT I THINK THAT IN THIS CASE THE LOW END GUIDELINE

9  OF TWENTY-ONE (21) MONTHS IS PRECISELY THE APPROPRIATE

10  SENTENCE AND THAT'S THE SENTENCE THAT WILL BE IMPOSED.

11  FOLLOWED BY THREE (3) YEARS OF SUPERVISED RELEASE UNDER THE

12  STANDARD TERMS AND CONDITIONS AND THE FOLLOWING SPECIAL

13  CONDITIONS.

14        FIRST THAT YOU PAY RESTITUTION OF FOUR HUNDRED AND

15  EIGHTY THOUSAND FOUR HUNDRED DOLLARS AND NINETY-SEVEN CENTS

16  ($480,400.97).

17        SECOND, THE MANDATORY PENALTY ASSESSMENT OF ONE

18  HUNDRED DOLLARS ($100).  THAT WILL BE PAYABLE AT A RATE OF

19  ONE-THIRD (1/3) OF YOUR EARNINGS WHILE IN CUSTODY AND

20  THEREAFTER TEN (10) PERCENT OF YOUR GROSS EARNINGS UPON

21  RELEASE.

22        SECOND, THAT YOU NOT -- OR THIRD THAT YOU NOT

23  POSSESS ANY FIREARMS, DANGEROUS WEAPONS OR EXPLOSIVE DEVICES.

24  BY VIRTUE OF YOUR FELONY CONVICTION YOU SIMPLY CAN'T POSSESS

25  SUCH THINGS.

1          FOURTH, THAT YOU BE SUBJECT TO THE WARRANTLESS

2   SEARCH OF YOUR RESIDENCE, PERSON, PROPERTY, AND AUTOMOBILE BY

3   THE DEPARTMENT OF PROBATION TO VERIFY YOUR COMPLIANCE.

4          FIFTH, THAT YOU BE RESTRICTED FROM ENGAGING IN

5   EMPLOYMENT, CONSULTING OR ASSOCIATION WITH ANY MORTGAGE REAL

6   ESTATE BUSINESS OR BANKING BUSINESS FOR A PERIOD OF THREE (3)

7   YEARS.

8          SIX, THAT YOU BE PROHIBITED FROM INCURRING NEW

9   CREDIT CHARGES, OPENING LINES OF CREDIT OR NEGOTIATING AND

10  CONSUMMATING FINANCIAL CONTRACTS WITHOUT THE APPROVAL OF THE

11  DEPARTMENT OF PROBATION.

12         SEVEN, THAT YOU PROVIDE THE DEPARTMENT OF PROBATION

13  WITH ACCESS TO ANY FINANCIAL INFORMATION THEY REQUEST OF YOU.

14         AND EIGHT, THAT YOU REPORT TO THE DEPARTMENT OF

15  PROBATION TO COMMENCE SUPERVISED RELEASE WITHIN SEVENTY-TWO

16  (72) HOURS OF YOUR RELEASE FROM CUSTODY.

17         Now Pretrial Services indicates you've complied

18  with all conditions.  I will allow you to report to the

19  facility designated by the Bureau of Prisons.  We'll set that

20  date, this is May 6 so -- Ms. Morgan, what's your

21  recollection as to how long it's taking for designation?  Is

22  it 45 or 60 days?

23         PROBATION OFFICER:  I've heard anywhere, Your Honor,

24  between 45 and 90 days.

25         THE COURT:  Okay.  We better make it 60 to be safe.

1    We'll make it July 10th, 2013 at 12 o'clock noon Pacific

2    Time.

3            Is there a request for a specific either facility

4    or geographic location?  Would it be in Texas?  Would that be

5    the request?

6            MR. BOULWARE:  A facility near Houston, Texas, Your

7    Honor.

8            THE COURT:  As near Houston as can be designed.

9    They do have facilities in Texas that I'm sure can

10   accommodate that or at least near Houston.  Might be in

11   Louisiana.  I'm not sure, but.

12           All right.  Anything further at this point --

13           MR. SCHIESS:  Yes, Your Honor.

14           THE COURT:  -- on behalf of the government or the

15   defense?

16           MR. SCHIESS:  Yes.  The order of forfeiture, will

17   the Court on the record that you're signing it and making it

18   a part of the judgment?

19           THE COURT:  It has been signed.  It will be made

20   part of the judgment of today's -- today's proceedings.

21            And were there other counts to be dismissed, Mr.

22   Schiess?

23           MR. SCHIESS:  Yes.  I'm going to move to dismiss

24   the remaining counts.

25           THE COURT:  Remaining counts will be dismissed as

1  part of the plea agreement.

2        Ms. Morgan.

3        PROBATION OFFICER:  Your Honor, we would ask that

4  the mandatory condition of the drug testing, annual drug

5  testing be suspended based upon the belief that the defendant

6  does not have a substance abuse issue.  And then if the

7  record may reflect she's being handed a copy of her

8  conditions of supervision?

9        THE COURT:  Yes, the record will so reflect.  And I

10 will suspend the drug testing requirement.  All right?

11       MR. SCHIESS:  Your Honor, if the -- Ms. Hilton has

12 not been the Marshal's when she entered her plea to have her

13 fingerprints and be processed, would the Court order her to

14 do that?

15       THE COURT:  Oh, I thought -- she was not you say?

16       MR. SCHIESS:  I don't know and I'm just covering

17 the bases in the --

18       PROBATION OFFICER:  Your Honor, when I prepared the

19 presentence report she had not been assigned a Marshal number

20 nor did we have a photograph --

21       THE COURT:  Oh.  Oh, okay.

22       PROBATION OFFICER:  -- so I don't believe she has

23 actually processed.

24       THE COURT:  Well, we need to do that right away, so.

25       MR. BOULWARE:  I'll have her do that --

1           THE COURT:  Why don't you go on downstairs right
2    now and get that accomplished?  It won't take long, just a
3    matter of getting photographed and providing some information
4    and printed and that's -- that's it.
5           MR. BOULWARE:  Your Honor, one -- the one thing that
6    I would ask is for the Court to waive the interest on the
7    restitution while my client is in custody.  Obviously while
8    she's in custody there is no ability for --
9           THE COURT:  Yeah.  No, it's routinely requested and
10   I routinely reject that.  No, I think it's an obligation that
11   should be subject to the interest bearing consequence so that
12   would be denied.
13          MR. SCHIESS:  And -- I was taking pretty good notes.
14   Did the Court advise her of her right to appeal?
15          THE COURT:  Yes.
16          MR. SCHIESS:  Thank you.
17          THE COURT:  All right.  Thanks everybody.
18          MR. BOULWARE:  Thank you, Your Honor.
19          THE COURT:  You can be excused and I'm going to
20   remain in session.
21               PROCEEDINGS CONCLUDED AT 3:21:45 P.M.
22                         *  *  *  *  *
23
24
25

NW TRANSCRIPTS, LLC - Nevada Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 989-3455 - gayle@nwranscripts.com

**CERTIFICATION**

I (WE) CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM
THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE
ABOVE-ENTITLED MATTER.

**NW TRANSCRIPTS, LLC**
**NEVADA DIVISION**
**P.O. BOX 890**
**NAMPA, IDAHO 83653-0890**
**(208) 989-3455**
**gayle@nwtranscripts.com**

/s/ Gayle Martin-Lutz
FEDERALLY CERTIFIED MANAGER/OWNER

Kay McCrea                                              05/20/13
TRANSCRIBER                                             DATE